An order will be entered accordingly.

**WHITMER et al. v. ATCHISON, T. & S. F. RY. CO. (PEPPARD SEED CO., intervenor).**

No. 5100.

United States District Court W. D. Missouri, W. D.

May 12, 1950.

See also, D.C.Mo., 9 F.R.D. 561.

254

Henry W. Fox and Donald Sharp (of Lathrop, Crane, Sawyer, Woodson & Righter), Kansas City, Mo., for defendant.

Lawrence Brown (of Stinson, Mag, Thomson, McEvers & Fizzell), Kansas City, Mo., Albert Thomson (of Johnson, Davis, Thomson, Van Dyke & Fairchild), Kansas City, Mo., for intervenor.

REEVES, Chief Judge.

This case was tried to the court without the intervention of a jury and at the conclusion of the evidence the case was submitted to the court upon the ·evidence and briefs and arguments of counsel to be supplied in writing. This action was one of a cluster of suits instituted against the defendant, growing out of alleged water damages in what was known as the Henrietta Drainage District in Ray County, Missouri, occurring in June, 1947. It is charged in intervenor's complaint that a bridge of the defendant over Willow Creek in Ray County, Missouri, was inadequate for the drainage of surface water and that therefore the defendant violated the express provisions of Section 5222, R.S. Mo.1939, Mo.R.S.A., and that in consequence growing crops owned by the intervenor were inundated and destroyed, and it brings action for damages in the sum of $27,565.

The evidence disclosed that other parties were the owners and lessees of the property affected by this intervention and that in April of 1947 the intervenor entered into a contract with the owners and lessees for the planting of seed corn to be furnished by the said intervenor. It was the stipulation in said contract that the intervenor "will furnish sound, viable, tested seed for planting the acreage covered by this contract;" and then it was agreed by the intervenor that it "does not and cannot in any way warrant the crop raised therefrom as the crop is dependent upon so many conditions beyond the control of first party."

It would be too burdensome to set out the entire contract as it is long and verbose. In substance, in consideration of the seed furnished by it, the right was extended by the property owners or lessees to the intervenor to supervise the production of corn planted on said premises, to detassel part of it as it might deem proper, and at harvest time it was granted the further right to select and sort out such corn as it might deem suitable for seed purposes from the entire crop thus harvested. It was in its power to reject the entire crop or to select part and reject other parts. Whatever was deemed suitable for seed purposes it agreed to pay the owners and lessees a slight premium over the market price. An interpretation of the contract would lead to the conclusion that only a small portion of the entire crop was to be selected by the intervenor for seed. It was obvious from the contract that, in order

to obtain a sound, viable and tested seed for its customers, careful selection and sorting would have to be resorted to. As a pledge, it exacted of the owners and lessees a promise to deliver such corn as it might select when the crop had matured.

By the 4th paragraph of the contract it was stipulated that the intervenor "is now, and shall at all times hereafter be, the owner of the seeds to be furnished second party hereunder, *as well as the crop, while growing, grown and harvested therefrom, and that second party* (owners and lessees) *will in no way or wise sell or dispose of, use, encumber, or permit to be sold, disposed of, used or encumbered, said seeds or the crop, while growing, grown, or harvested therefrom,* etc." (Emphasis mine.)

It is upon this paragraph that the intervenor bases its claim of ownership. Admittedly the crop was destroyed by surface water when the corn was young or approximately ten inches high. And, according to the evidence, settlement for such loss or damage was made by the defendant with the owners and lessees of the land upon which said corn had been planted. Intervenor, through one of its witnesses, estimated the expense that would have accrued to it if the corn had matured, and stated that 88% of the corn would have been suitable for seed, and that it had contracts for the disposition of such seed corn at $9.76 per bushel. This was the wholesale price. After deducting the expenses, which it computed at $4.72 per bushel, it concluded that it had lost $5.04 per bushel on the corn that speculatively and conjecturally might have been matured on the premises except for the flood or water damage. The quantity which it believed could have been produced was based upon the production on other good land or land similarly located in a certain crop year.

The defendant denies its responsibility for the water damage, invokes the doctrine of estoppel against the plaintiff, and disputes the correctness of the computation as to the damages. And, furthermore, it denies the right of the intervenor to bring this action.

Other facts as they may become pertinent will be stated in the course of this memorandum opinion.

■ 1. On the question of responsibility or liability of the defendant for the overflow, it appeared, as contended by the plaintiffs, as well as the intervenor, that the bridge over said Willow Creek was inadequate for drainage purposes. This inadequacy arose from the fact that obstructive or damming material had been thrown into the creek bed by the defendant. It had introduced above the bridge certain sludge from a water purification or cleansing plant, and the piling of the bridge was so constructed as to obstruct the passage of driftwood or silt, and that the creek bed had become filled up.

2. When the intervenor first made its claim or intervened in this action it did not assert ownership of the property. It did not do this for at that time the property owners and lessees had filed their interventions and had claimed damages to their properties by reason of the loss of the identical corn crop. On March 9, 1949, settlements were made with the property owners and lessees for damages accruing to them by reason of the loss of the corn crop which is the subject matter of this particular intervention. After this settlement was made the intervenor, on September 22, 1949, filed an amended intervening complaint wherein, as stated, it claimed full ownership of the property.

3. A casual reading of the contract made between the intervenor and the property owners shows beyond all controversy that it was not the owner of the crop. It merely furnished the seed for planting, and for such consideration it procured an agreement from the property owners or lessees to sell to it and to permit it to select suitable seed corn, if and when such suitable seed corn had matured.

For instance, by the second paragraph of the contract, this language appears:

(Intervenor) "has secured special corn hereinafter referred to as 'ear-parent corn' and 'pollen-parent corn' which when properly planted and crossed produces, upon the 'ear-parent' stalks which have been

detasseled, a hybrid corn *from which corn suitable for seed corn can be selected* (emphasis mine) and produces upon the 'pollen-parent' stalks which have not been detasseled, corn not satisfactory for seed corn but satisfactory for feeding purposes only. *Seed corn shall be defined and determined by the first party as the amount of corn remaining after discarding all ears, shelled corn, etc., which are not suitable, in the opinion of first party, for the high standard and quality of Funk's 'G' Hybrids. This discard will be known as market corn.*" (Emphasis mine.)

The danger of pollination from outside sources was considered in the contract, and then there was this provision: "If by any alteration of isolation as herein agreed, the same cannot be adjusted to meet the requirements of first party this contract shall become null and void and above-mentioned field or fields shall become the property of second party to be used for feed purposes only after being ground by second party; and in such event neither party shall have any right against the other for damages in any amount."

■ Other parts of the contract, as indicated, disclose that the fields of corn were mere pledges to secure the fulfillment of the contract at the election of the intervenor. It would follow that the intervenor was not the owner of the growing corn, as like every mortgage or deed of trust in Missouri, regardless of recitals, the mortgagee or the cestui que trust has a lien and nothing more. The lien held by the intervenor only entitled it, upon maturity of the corn crop, to choose and select such portions of the matured crop as it believed would be suitable for seed purposes. Its security failed, and its recourse would be against the property owners who were paid for the loss, as its lien would extend to the proceeds of that settlement.

■ For the purpose of this decision, the growing crop in question should be treated as personal property, although, as frequently stated, the question whether personal property or real estate has become involved in a mystic maze of uncertainty and contradiction. The only conclusion deducible from the authorities being that a growing crop is a sort of legal species of chameleon. Note 8(2), 25 C.J.S., Crops, § 1, p. 3. Be that as it may, it was distinctly held in Hill v. Brothers, Mo.App., 217 S.W. 581, 582, that: "It is well-settled law that, this being an annual crop, was capable of being treated as a personal chattel. Davis v. Cramer, 188 Mo.App. [718], loc. cit. 722, 176 S.W. 468; Swafford v. Spratt, 93 Mo.App. 631, 67 S.W. 701."

■■ 4. Treating the growing crop as personal property, then, in order to make its mortgage effective against subsequent purchasers, its contract or mortgage should have been recorded. Failure of recordation made the contract absolutely void as against subsequent purchasers. While probably the defendant in this case is not in the same class with a purchaser, nevertheless by analogy the intervenor should be estopped as to it in precisely the same way that it would have been estopped to assert the legality of its mortgage as against a purchaser.

■ Quasi estoppel is a doctrine which precludes a person from maintaining a position or attitude inconsistent with another position or attitude which is sought to be maintained at the same time, or which was asserted at a previous time. 31 C.J.S., Estoppel, § 108, p. 341. The intervenor should not be permitted to change its attitude, and, moreover, as indicated, it has no right to maintain this action.

■ 5. Neither should the intervenor be permitted to recover upon its evidence as to damages which, according to all of the evidence, including the wording of its contract, was speculative and conjectural. It understood that it could not be assured of a good crop of seed corn "as the crop is dependent upon so many conditions beyond the control of first party (intervenor)". There was danger of pollination from an outside source. There was the probability that there would be no detasseling; there was a probability that the corn would not be suitable; and, moreover, according to the terms of the contract, it was never

contemplated that the intervenor would claim 88% of the production for seed corn. Common experience would lead one inevitably to believe that such a production could not be reasonably in contemplation, even if intervenor were entitled to maintain this suit. Yet the damages claimed are too speculative and too conjectural to warrant a judgment in its behalf. It would follow that the intervenor is not entitled to recover and judgment should be rendered for the defendant.